May it please the Court, Your Honor. My name is Jeff Price. I represent the appellant, Denise Fowler. I would like to reserve four minutes for rebuttal. I need to try to speak up. Yes, I would like to reserve four minutes for rebuttal, please. You have to keep track of your time. Your Honor, I represent Denise Fowler. At the time, in 2004, she was a 40-year-old mother of three living in Palmdale, working full-time, had never even been arrested, had no criminal history whatsoever. I would like to address the Batson issue first, then move on to the conspiracy issue. What was her work history? She was a long-time employee in a call center for a hotel chain, which she continued to work for up until the trial. During virtually all of the telephone calls that were intercepted by the government in this case, which ultimately led to her imprisonment, she was at work and being hounded by Ray Maxwell, who was the ringleader of this bank robbery enterprise, which was a far-reaching conspiracy that existed months prior to the time that Ms. Fowler even met Mr. Maxwell on Easter Sunday in 2004, and which had perpetrated numerous bank robberies prior to the time that she ever met him. Her whole involvement in this case stems over a period of seven days, from May 21st to May 28th, 2004. What work did she do? She was a call center employee. She worked in a call center. She fielded calls for the Starwood Hotels Group all day long. She made reservations and handled customer service calls. What's her educational background? I believe she had a high school diploma. What was her employment history? She had regularly been employed. She had three children, a couple of whom were adolescents, and she was living with her children, and she was supporting her children and living in Palmdale. She actually moved out of L.A. to protect her son from getting involved in gang-type activity in L.A. That's why she went to Palmdale. So she was gainfully employed for years and years, and there was a character witness who testified for her in the trial about her exemplary employment performance. Well, where did she work before she worked in this hotel business? She did actually work in a check-cashing company and was actually the victim of an armed robbery earlier in her life. Okay. I would like to discuss the Batson issue very briefly because time is running out. This case centers on step three of the analysis, and as this court discussed in Kesser v. Camber, which is an en banc decision, the totality of relevant facts in this case demonstrates that the reasons given by the government for striking Juror J.M. were pretextual, and under Chinchilla, which is cited in the Kesser case, the fact that one reason is pretextual gives an inference that other reasons that may be prima facie race-neutral are actually not race-neutral. What about the sentence? The sentence is unreasonable. The sentence is unreasonable in several respects, but primarily because the district court failed to and simply out of hand rejected the argument that this was aberrant behavior on the part of Ms. Fowler, which it obviously was. There is no way to even begin to find that it was not aberrant behavior, and there was no evidence in the record that it was not aberrant behavior. But the judge, just as he rejected out of hand the Batson challenge... The sentence was within guidelines, right? What was the guideline range for her? It was within guidelines. What was the guideline range? I do not remember the guideline range, but I believe her sentence was 46 months, which was within guidelines, and then she got seven years for the 924C, for which there was absolutely no evidence supporting it. Let's turn to the question of the gun enhancement or the gun charge. Yes, that was a conviction that was founded upon Pinkerton liability, so therefore it is founded on what would implicitly be a finding by the jury that it was reasonably foreseeable to Ms. Fowler that a firearm would be used and brandished in the activities of this conspiracy. There is not a single piece of evidence in the record that anyone in her position could foresee use of a gun. There's no mention of a gun. There's no mention of a robbery. There's no mention of a bank. This is all conceded by the government. Yes, although there clearly is evidence in the record that she understood that this guy had knocked over banks, that she was helping him find a driver, and that she was aware that something was going on. She gets her niece involved and calls another friend to get them involved. Now, what did she think that they were doing in the course of these bank robberies? Your Honor, respectively, respectfully, respectfully, I'm sorry, there was no evidence in the record that she knew that Maxwell was knocking over banks. That argument is... She was recruiting drivers for plot then. No one would know except for Maxwell. The evidence upon which the argument that Ms. Fowler was aware that there was a bank robbery or a robbery, even a robbery, is based upon the word lick. The government argues that lick has been defined as being a bank robbery or a robbery. That does not prove anything under conspiracy theory. That does not prove that Ms. Fowler knew that the word lick, which she used in the course of interviews by law enforcement, which were not recorded, meant a robbery. There was testimony by an FBI agent, Agent Papuyo, whom I called as a witness, who testified that lick could mean a theft, a burglary, a robbery. There was also testimony by Mr. Sanders, who was one of the people that Ms. Fowler put in touch with Mr. Maxwell, that he didn't understand a lick to only mean a robbery. He understood it to mean a come up. Some money falls out of someone's pocket, you pick it up, that's a lick. There's no evidence that Ms. Fowler understood the word lick to mean a robbery. What in the world did the man Maxwell need these drivers for and all this secrecy and so forth? Lick ain't going to the Walgreens store. He kept referring to picking up his money. So let's say he were a drug dealer. He needs to pick up his money. That's not a robbery. That's picking up money. That happens all the time. In fact, in the gang context, which is not really an issue in this case, gang members, Mexican mafia members, they have money picked up for them all the time. That's how they do their business. That's how they stay in business, like the law. They get money from people who they give protection to. So maybe he was doing that. There's nothing in any of the calls showing that there was a robbery. In order to show Pinkerton liability, what does the government have to show? The government has to show that, number one, Ms. Fowler was a member of a specific conspiracy, which they did not do. This particular conspiracy is a far-reaching conspiracy stemming over many months. There were several bank robberies. Let's suppose that I thought there was sufficient evidence. I will only speak for myself. Let's suppose that I thought there was sufficient evidence to find that she was a member of a conspiracy. Now, what else must the government show in order to get her under Pinkerton liability for the armed robbery? That it was reasonably foreseeable that an armed robbery, and specifically as to the 924C count, that a firearm would be used. That was my timer. Specifically, that it was reasonably foreseeable under Pinkerton. I filed a Rule 28J letter yesterday with citation to a case that cites the Falcone case, which I previously cited, which is a U.S. Supreme Court case from the 40s, which addresses the knowledge element in the Pinkerton context. Well, you want to save your time. I will go on. That's the first time I ever had a lawyer have a signal on the side, you know. I'm sorry it went off. I didn't know it was going to actually go off. No, that's all right. That's all right. But so to answer Your Honor's question, essentially that it was reasonably foreseeable to Ms. Fowler that this would occur. So I've cited the Castaneda case. There are other cases that this Court has addressed this issue in. But there's no presumption of foreseeability. That is clear. So if Ms. Fowler knew that Maxwell was doing licks and she was helping to procure drivers for that, and licks could refer to a whole variety of things, some of which might be armed and some of which wouldn't necessarily be armed, your position is that the government would still have to show something else. Yes. If licks referred to burglaries, burglary wouldn't necessarily involve force of arms. But if she knew that licks referred, in his particular case, referred to bank robberies, that might be a different case. Correct. Okay. Well, how do you know that? How do I know that the government would have to prove something else? No. How do you know that bank robberies always involve guns? You don't, because they don't. That's another point that I mentioned. Bank robberies, there are all kinds of bank robberies that are paper bank robberies. They don't involve guns. So even if it were, even if she thought that he were doing bank robberies, there's absolutely no evidence that it was going to be armed. Zero. That's the record. You want to save some more time? You've only got two minutes and 38 seconds. Yes, thank you. May it please the Court. My name is John Legend, and I represent the United States of America. Why don't I jump right into the question that Your Honor asked about the sufficiency of the evidence. In this case, there was evidence that the defendant, Ms. Fowler, should have been aware or reasonably foresee that a gun was going to be used. You've got a large amount of evidence presented to the jury. First and foremost, you've got the testimony of Special Agent Steve May, who's an eight-year veteran of the FBI and served on their bank robbery squad. He had talked about what kind of robbery, about the robbery crew and what it takes to put a robbery crew together. Just to be clear, we're talking about a- Was he talking about crews in general, or was he talking about this crew? He's talking about, he talked about crews in general. Okay. And then actually drew, he drew, identified who in this organization fit into that. So we're talking about a takeover robbery as opposed to a simple no-job where one's going to be walking in. And one thing that Special Agent May talked about is you need multiple cars. He said that you need stolen cars. They often use drivers that are women because they think that the women are less likely to be stopped by the police. He talked about the need of having people to go in and hold down the floor. Hold down the floor is to brandish a firearm or some sort of a weapon, intimidate people so that the other members can jump the counter, which is jump over the teller counter, empty the drawers so the crew can get out, and talked about the need for escape. And that's set forth in the, I think, pages 7 through 17 of the government's excerpt of the record. In this case, and the thing that's very important about this, Special Agent May said that you've got a lot of moving pieces. He equated it to a puzzle. And he said if one of the pieces drops out, it breaks down. It doesn't work well. That's very, very helpful, Counsel, in explaining why Maxwell structured this thing in the way that he did. Now, what evidence is there that Fowler understood that structure and was as smart as this agent in knowing what all the moving pieces were and why women were being recruited as drivers that would have indicated to her that this was a takeover robbery as opposed to a note robbery? Well, what we don't have is a smoking gun, no pun intended. We've got a conspiracy, so they're being careful on the telephone calls and what they say. And they're talking in code. But the code is coded language. You think they were careful in what they were saying? Come on. I think they were careful in the sense they didn't come out and say, oh, this is a robbery, so-and-so is going to have a gun. They're using the. Okay. Right. But the code could have been code for these are robberies. They're going to be note robberies. And, again, Fowler is not as smart as Agent May. So it's not like she can say, oh, I understand how this is going down. This is a takeover robbery as opposed to a note robbery. And, therefore, you want women drivers. I've got a niece who can be a good woman driver because I understand that the police are not as likely to stop her as they would be to stop you after the course of a robbery. Okay. The theory is great. I understand all those pieces. That was terrific to put that on. Now, what can you do to connect Fowler to understanding that that was the kind of robbery that was going on and that guns would be used? What you have is you have a number of things. You've got the telephone calls, which I'll jump into in a second. But let me start with Keisha Fowler, her niece. One of the people she tried to recruit to drive was Ms. Fowler. I'm sorry, Keisha Fowler. And she knew that Keisha had done licks before with Mr. Maxwell and that she knew that one of the things that Maxwell did was for a living was these types of licks. And what's important is, and this comes out in the telephone calls, is that the defendant talks about her niece getting spooked. That was the word they used. She was spooked. And the concern, and Maxwell came back and said, well, I'll take care of the security. I'll make sure that the person who's going to be in the car with her is the other woman, Theresa Hall, whose nickname was Girl Blue, in order to at least assure her that she was not going to be in the car, presumably with people that were carrying guns or people that were very dangerous. Did they use the word guns? No, they never did. Okay. Well, you just used it, didn't you? I used it. I'm sorry. Yeah, you used it. It was easy to use, wasn't it? It was easy for me to use. Yeah. What was the disposition as far as Maxwell was concerned, the man she talked with? I'm sorry? Was the man, you say the ringleader and the planner and so forth, what was the disposition? Was he charged in this case? Yes, he was. And was he convicted? Mr. Maxwell was convicted. He pleaded guilty. He got 360 months. Yes, Your Honor. Very well. He did. And it was, I think, for this robbery and for the other ones he participated in as well. He pled guilty. Yes, Your Honor. 360 months. And Herbert Moore? Herbert Moore. He was one of the ringleaders. He was a ringleader as well, Your Honor. He got 168 months. Yes, Your Honor, he did. And Charles Moore, who was the guy that actually went into the bank with two teenagers and and he testified during Fowler's trial. As a matter of fact, out of all these people, only two went to trial, Fowler and another woman. Dean Martin, the co-defendant. Yes, co-defendant. And Dean Martin was acquitted. Yes, Your Honor. And so Charles Moore, who was a young man and his uncle was Herbert, he went in there. He brandished the gun. He told everybody to lie down. And the two teenagers got the money and they all left the place. And he was arrested shortly thereafter. Right? Yes, Your Honor. Yeah. And he got 67 months. Right? I'm sorry. He got 57 months. 57 months. Yes, Your Honor. 57 months. And Teresa Hall, who was the person who directed the robbery, and she was at the scene. And she drove one of the vehicles. And she got 121 months. Yes, Your Honor. I don't think she was one of the directors, but she was one of the drivers for the crew. Well, that's what I said. Drove one of the vehicles. Yes, Your Honor. Is that right? Yes, Your Honor. That's correct. Okay. And then Denise, when she was contacted, that's Denise Fowler. Excuse me. Denise Fowler's niece, Keisha, and see if she'd be interested in driving the vehicle. And she agreed, and then she changed her mind. And she testified, Keisha, at the trial. She testified for the government, and she got 46 months. Yes, Your Honor. And Fowler, the defendant, she wasn't there at the robbery, was she? She was not. She wasn't part of the planning of the robbery, was she? Actually, she did. She wasn't there when this strategy was laid out. She wasn't there for the planning of the robbery. I just asked you. I said she wasn't there for the planning. She was not at the planning meeting, Your Honor. Can't you answer the question? Yes, I can. Okay. She wasn't there for the planning. She'd never been convicted of anything before in her life. At one time, didn't she work for ICE? I'd have to go back and take a look at that. Didn't she work for Social Security? She may have worked for a government agency. She had a good history of working. Yes. Never been on welfare. I'm not aware of that, Your Honor. And so she got hooked up with this guy, Maxwell, who was kind of a professional bank robber, right? That's correct. Yeah. And he pressured her to make these phone calls, one to her niece and one to another person. He certainly encouraged her, Your Honor. He pressured her. I would say. Hardly encouraged her. He certainly encouraged her, and he pushed her strong, but at no point did she back out. Pushed her strong, yeah. She had an opportunity a number of times. But, you know, there she was in love and all that, and she was how old was she? I'd have to check. I think she was in her 40s. And so her niece, Kenesha, said yes, then no. And the other person she called, that's the woman that was acquitted, she said no, too. The woman who was acquitted actually went through with the driving. It was another gentleman. She contacted Anthony Sanders, who decided he didn't want to do it. So anybody she called at the behest of Maxwell, a mastermind, she flunked out, right? She wasn't very successful at it. Well, she ultimately was successful. She was able to get Deneen Martin a drive for Mr. Maxwell. She was able to provide that last piece of the puzzle that he repeatedly said on the telephone that he needed. And what happened with Martin? She was acquitted. Deneen Martin was acquitted. Okay, so the last piece of the puzzle didn't work out that well. So now what is there to show that the defendant, Fowler, that it was reasonably foreseeable to her that this Charles Moore, had she ever met Charles Moore before this? He went to the bank? I don't recall that she did. Oh, she didn't. There's nothing, there's nothing in the evidence to show she met him. So here's a woman, never been involved in any criminal activity, been working, as far as we know, her adult life. I think she did attend college at Trade Tech, which is a community college. And she has a romantic relationship with a professional bank robber, and that relationship didn't last very long, did it? No, it did not. Yeah, and so this foreseeability that she has to have reasonably foreseen that this guy, Charles Moore, would go in there and brandish a gun, and start yelling at people, and send these two teenagers that were never, as far as I know, the record doesn't have any reference to them. She didn't, knew nothing about them, sent them over the counter to get the money, and then they all rush out, and they were, what, caught within how many minutes after? A few minutes after they left the bank. A few minutes after, yeah. And so how can you say that she could reasonably have foreseen that this idiot that went in there and brandished a gun, you know, that was foreseeable? How do we justify that? You can justify it based on the totality of the circumstances. I cannot point to one single piece of evidence that says that's it. That, Your Honor, is the one piece of evidence that you can hang your hat on. And she was the only one, she was the only one that got that seven-year mandatory, right? Yes, she went to trial on that. Oh, she went to trial. She went to trial. Is that a crime? No, it's not, Your Honor. No? What did she do? She exercised her constitutional right to go to trial? Absolutely. And that's why she got the seven years. But the difference is, Your Honor, if somebody is pleading guilty as part of the plea bargaining process, that element is going to drop out. The individual, I don't have the PSR in front of me, but the PSR. If she felt she was innocent, that she had never been involved in any criminal activity, that this guy used her, which he did, that's the way I read this record, he used her, and that's not uncommon. You know, she falls in love with this idiot who couldn't even organize, you know, he was so well organized he's doing 360 years in prison. How many years has he done before that? I'm not sure, Your Honor. He had a big record, huh? Professional. He must have. And he had a hell of a time putting this whole thing together. It was just kind of like hanging by a thread. And so, you know, so this woman, she gets the seven years. Does that equal justice under the law? Your Honor, I would argue that it is. I'm asking you that. You're representing the United States of America. She was convicted of the crime of... I asked you, does that equal justice under the law? I would argue yes. What? Yes, Your Honor, I would argue it is. Don't argue. Tell me what you feel in your heart. I would feel that she went ahead and committed, she was involved in the conspiracy to commit the bank robbery. The government's position is, under the totality of the circumstances, the jury... Her connection to the conspiracy, you know, there's evidence to show that she was... I'm not arguing that there isn't evidence to show that she was a member of the conspiracy. But that evidence, that evidence, the connection is very slight in the scheme of things, right? In the grand scheme of things, yes, it's slight. Yeah, it is. But it's there. Yeah, yeah. But if I can answer your other question, Your Honor, about the just nature of this. You've got to remember a couple of things as well. In addition, Ms. Fowler, when she came in, she ultimately withheld evidence from the police when she was interviewed. And when she took the stand, she perjured herself. She denied calls that were there. She was not, those things were not enhanced in the sentence. At the end of the day, however, Ms. Fowler decided to exercise her constitutional right, which we respect. And she went ahead before what the trial... Was she given an offer before? I don't know, Your Honor. I was not the... I don't know. I just tried the case. I was not part of the investigation. Well, you just tried the case? I was one of the lawyers that tried the case. Okay. Was she given a plea offer? I know that she met with the government. She did a proffer. I think she wore a wire at one point. She wore a wire. She wasn't very successful. No, she was not. Yeah. The detectives who interviewed her, Detective Harmeo, ultimately determined that she was withholding information. She was not being forthcoming. And she decided ultimately, after initially trying to cooperate with the government... What information was she withholding? According to Detective Harmeo, on pages 56 and 57, he felt that she was not forthcoming with respect to all the knowledge she had with respect to the robbery crew and what was going on. The – he noted the things she said, but in his testimony, he said, ultimately, after he reviewed his notes of Mr. Price's request, he determined that she was not forthcoming. That was his subjective belief. It is his subjective belief as a 17-and-a-half-year member of the Los Angeles Police Department. Well, that doesn't cut any ice, does it? I would certainly say that he has some experience in dealing with individuals and doing interviews and proffers. I don't know. You know, 17-and-a-half years. But I think what Your Honor is asking about ultimately was justice. Your Honor, he's not on television where he solves everything quickly. No. I can say in my almost decade as a prosecutor, I've never seen many cases where they are solved within an hour. It would make my life a lot easier. But going back to the issue of justice, is it just or not? She decided to exercise her constitutional right and go to trial. She decided to roll the dice. She didn't plea bargains.  She didn't say I'm going to roll the dice. She decided she wanted to, she felt that she could, she felt that she was innocent. And she wanted to exercise her right to have 12 members. She felt she was innocent. That's what she felt. That's what she felt, yeah. And so she thought, well, she wanted to go to trial. And she did. And she gets, she's the only one that gets the mandatory seven years.  And maybe she thought she could beat the charges based on sufficiency of the evidence, which is often why our defendants go to trial. But unlike Teresa Hall, unlike Charles Moore, unlike Keisha Fowler, she did not plead guilty. She did not get the benefits of a plea bargain in the sense of charges would be dismissed. She did not come forward and testify and cooperate against other members. As a result, she's going to get a higher sentence. Oftentimes in these types of cases, the person at the end of the line gets a sentence more significant than the other people. When you dealt with Charles Moore, part of the deal, that secret deal that was sealed, was that he was going to cooperate. And then he was going to, government was going to get him that, get that seven years eliminated. So he got 57 months. And I think she got, I'm trying to remember, I think 46 months. No, she got consecutive, two consecutive sentences of, I think they were in the 60s, 63. And then she got the seven years. Actually, Your Honor, she got the low end of the sentence. I don't care about what lower end of the middle. The sentencing guidelines are, you know, they're unconstitutional, too. You know that, don't you? I'm also told they're advisory. I know, I know. That's another game we play. But anyway, so that's it. You know, it's fascinating. You'll see this on TV in about three months. Hopefully somebody more good looking than me will play my part. Thank you very much, Your Honors. All right. I only want to say. You sure you don't want to say any more? We know what you're going to say. You know. I just want to say that she did not perjure herself. That's it. All right. Thank you. All right. Order submitted. For the next case.
judges: Davidson, Pregerson, Bybee